# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARY ANN SMITH MOORE,

      Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

No. 14 C 0922

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Mary Ann Smith Moore filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II and for Supplemental Security Income under Title XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq*. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.* The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

On December 2, 2010, Plaintiff filed a Title II application for disability insurance benefits and a Title XVI supplemental security income application. (R. at 21). In both applications, Plaintiff alleged disability beginning November 29, 2007 based on degenerative bone disease, arthritis, asthma, depression, numbness in hands and feet, complications from broken left hip, knee pain, Gastroesophageal Reflux Disease (GERD), migraines, and hearing loss. (R. at 121). Both claims were denied, initially on May 13, 2011 and upon reconsideration on July 8, 2011. (R. at 122, 126). Plaintiff filed a written request for a hearing on July 12, 2011. (R. at 134). The hearing took place on July 13, 2012 in Chicago, Illinois. (R. at 40-94). Plaintiff, represented by counsel, testified at the hearing before an Administrative Law Judge (ALJ). (*Id*.). The ALJ also heard testimony from Ellen Rosenfeld, a medical expert, and Kari Seaver, a vocational expert (VE). (*Id*.).

The ALJ denied Plaintiff's request for benefits on October 17, 2012. (R. at 18, 21-35). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since November 29, 2007, the alleged onset date. (R. at 24). At step two, the ALJ found that the plaintiff has the following severe impairments: adjustment disorder with mixed anxiety and depressive features and osteoarthritis. The ALJ found the following non-severe: GERD; hand tremor without diagnostic work-up; asthma; hearing loss; and status post-hip fracture in 2007 treated with surgery. (*Id*.). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of

impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id*.).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) except that:

> claimant can lift/carry 50 pounds occasionally and 25 pounds frequently; stand/walk 6 hours; sit 6 hours; unlimited pushing and pulling; never climb ladders/ropes/scaffolds but can perform the remaining postural activities occasionally; she can perform frequent manipulation bilaterally with her upper extremities. (*Id*. at 26). The ALJ further determined Plaintiff can perform 2-3 step tasks, with no fast paced production requirements, but can have end-of-day quotas and should work in a predictable work environment.

(*Id*.).

Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is unable to perform any past relevant work as a certified nurse's assistant. (*Id*. at 34). At step five, the ALJ considered the claimant's age, education, work experience, and residual functional capacity, and found that there are jobs that exist in significant numbers in the national economy that the claimant can perform. (*Id*.) Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the act, for purposes of DIB or SSI. (*Id*. at 35). The Appeals Council denied Plaintiff's request for review on January 7, 2014. (R. at 1). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 67576 (7th Cir. 2008).

# III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d

589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE[3]

On October 29, 2007, Plaintiff fell onto her left side while at work causing a left nondisplaced acetabulum fracture to her hip joint. (R. at 302). Walter Virkus, M.D., an orthopedic surgeon at Midwest Orthopedics at Rush, treated Plaintiff for her hip fracture from March 2008 through June 2008. (R. at 292-316). Dr. Virkus noted

---

[3] Plaintiff previously applied for Disability Insurance Benefits and Supplemental Security Income in applications filed on October 10, 2006. On December 3, 2009, ALJ Helen Cropper found Plaintiff not disabled. (R. at 95). In light of this decision, the ALJ in this case determined that *res judicata* is applicable through December 3, 2009. The ALJ found the relevant period to be December 4, 2009 to December 31, 2011 (Plaintiff's last date insured) for purposes of the Title II application, and December 4, 2009 to the present for the Title XVI application. (R. at 21). Plaintiff contends the ALJ improperly limited the scope of her analysis to the period beginning December 4, 2009. (Plt. Br. at 4). The Court finds the relevant period for purposes of DIB and SSI benefits starts December 4, 2009. However, the prior ALJ decision does not render earlier evidence inadmissible; rather, the ALJ must consider evidence from the period *res judicata* as it relates to the evidence in the current period of disability. *See Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) ("although the final judgment denying [claimant's previous] application was *res judicata*, this did not render evidence submitted in support of the application inadmissible to establish, though only in combination with later evidence, that she had become disabled after the period covered by the first proceeding."). The ALJ must consider all relevant evidence, even that evidence that predates the earliest disability date or postdates the date last insured (DLI). *See Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010).

limited range of motion in Plaintiff's hip and pain with adduction and abduction. (R. at 302). Plaintiff reported that her hip injury made it impossible for her to bear weight and required her to use a walker. (*Id*.). Dr. Virkus recommended that she transition to a cane instead of a walker and undergo aggressive physical therapy. (*Id*.).

On March 10, 2008, Plaintiff began treating with physical therapist Jill Lohmann at Accelerated Rehabilitation Centers, identified her pain as 4-5/10, and was no longer taking pain medication. (R. at 339). An April 11, 2008 report indicated she was progressing fairly well, and her tolerance for standing had increased to one hour. (R. at 298). Standing for longer than one hour increased her hip pain. (*Id*.). On April 16, 2008, Dr. Virkus determined Plaintiff could return to work in a limited capacity: no lifting greater than 10 pounds and no walking greater than 200 feet at a time. (R. at 301). Plaintiff progressed to being able to lift 25 pounds to waist height and walk 15 minutes on the treadmill without a left gait deficit. (*Id*.). Ms. Lohmann reported that Plaintiff had met all of her treatment goals and was functioning between light and light/medium physical demand levels as of May 19, 2008. (*Id*.). On May 21, 2008, Dr. Virkus cleared Plaintiff for light duty, with no lifting or carrying greater than 15 pounds. (R. at 300).

On June 5, 2008, Accelerated Rehabilitation Centers executed a detailed functional capacity evaluation identifying Plaintiff's physical capabilities and tolerance to function at the Light-Medium level. (R. at 305). Dr. Virkus evaluated Plaintiff on June 11, 2008, noting an improved gait, but still some residual pain. (R.

at 292). Dr. Virkus limited Plaintiff to light-medium work with no lifting to the waist greater than 30 pounds, and no lifting to shoulder greater than 23 pounds. (*Id*.). The report indicated Plaintiff had reached maximum medical improvement. (*Id*.).

In February 2009 at Englewood Health Center (Englewood), Plaintiff described hip and back pain at a 6-7/10 and the physician recommended pain medication and use of a cane. (R. at 386-87). An April 8, 2009 report evaluating Plaintiff's spinal stenosis showed normal bone density, no significant degenerative changes, and no evidence of fracture or subluxation. (R. at 355). On September 23, 2009, Plaintiff described back pain as a 7/10. (R. at 383). The physician noted Plaintiff's unwillingness to return to work because of back pain. (R. at 383).

In routine check-ups at Englewood on February 10, 2010 and June 1, 2010, Plaintiff denied pain and described it as 0/10, but the records note that the patient was there for ongoing back and hip pain. (R. at 379, 380). On August 13, 2010, the record indicates "routine checkup c/o head cold denies pain"; however, the progress notes state Plaintiff was in severe pain the days prior to the visit as a result of lower back injuries, pain was 5/10 in the left arm, and there was swelling and tenderness in her left arm from shoulder to wrist. (R. at 378). Further, the treating physician observed that Plaintiff's arms were tender to palpation. (*Id*.). Plaintiff attended physical therapy at Provident Hospital three times in August 2010. (R. at 347). Plaintiff reported pain at 7/10 in her back and 5/10 in her hip. (R. at 348). The physical therapist noted that Plaintiff's left knee gives out, that Plaintiff can walk

half a block, stand 5-10 minutes, and sit 30 minutes. (*Id.*). On October 26, 2010, Plaintiff returned to Englewood presenting with a headache lasting constantly for a month, and for which Tylenol provided no relief. (R. at 377).

On January 10, 2011 at Stroger Hospital, Plaintiff reported sinus pain that continued intermittently throughout her life, as well as neck and back pain slowly worsening in recent years. (R. at 437). Plaintiff was diagnosed with unspecified joint pain, sinusitis, asthma, and GERD. In January 2011, Plaintiff received emergency treatment for a sinus infection, and returned for treatment of sinusitis, TMJ[4], and nasal complaints on March 9, 2011. (R. at 371, 373). On October 31, 2011, Plaintiff reported experiencing a popping noise in her ear followed by draining yellow fluid and decreased hearing in the left ear. (R. at 448). The treating physician at the Ear, Nose and Throat (ENT) Clinic at Stroger prescribed oral antibiotics for Plaintiff's left ear. (*Id.*). On December 19, 2011, Plaintiff still had decreased hearing on her left side. (R. at 449). Records from both of those visits noted that Plaintiff was "known to ENT clinic for TMJ." (R. at 448, 449, 451). On February 14, 2012, Plaintiff returned to the ENT clinic complaining of left TMJ pain. (R. at 445). The ENT observed a "capsular dislocation with reduction of the left joint and with some mild tenderness," but recommended a conservative treatment plan because of Plaintiff's medical history with GERD. (*Id.*). By February 22, 2012, Plaintiff's TMJ

---

[4] Temporomandibular Joint disorder: "The temporomandibular (tem-puh-roe-mun-DIB-u-lur) joint (TMJ) acts like a sliding hinge, connecting your jawbone to your skull. TMJ disorders can cause pain in your jaw joint and in the muscles that control jaw movement." (Mayo Clinic website: http://www.mayoclinic.org/diseases-conditions/tmj/basics/definition/con-20043566).

had improved and medical records note Plaintiff "complains of itchy ears, otherwise no problems." (R. at 451).

On April 11, 2012, Reena Paul, M.D., evaluated Plaintiff at Stroger. (R. at 440). Plaintiff complained of ongoing and worsening neck pain, now with a knot on her neck. Plaintiff stated the neck pain began after her ear infection a year earlier. (*Id*.). Plaintiff also reported a hand tremor that occurred even while at rest and caused her to drop things. (*Id*.).

### Robert Swanson, Clinical Psychologist

On March 17, 2011, Robert Swanson, Ph.D., a clinical psychologist, treated Plaintiff at Englewood. (R. at 458-461). Dr. Swanson opined that Plaintiff "is not planning, intending, or has taken any step in preparation for self-harm," but prescribed Lexapro. (*Id*.). The report indicated intermittent and inconsistent use of medication in the past and described Plaintiff as "vague" when asked about alcohol use. (*Id*.). Swanson's report revealed that Plaintiff "had previously sought recommended therapy at Englewood [Mental Health Clinic] but stopped after that clinic's request for financial documents. She believes that Community Mental Health Council would also require payment, and further she has no transportation to get there." (*Id*.). Dr. Swanson recommended Plaintiff return for a follow up visit in six weeks.

On February 28, 2012, Plaintiff returned for a follow up visit. (R. at 460). During the visit, Plaintiff described ongoing stress from financial hardship as a result of her husband's two heart attacks and inability to work. (*Id*.). Plaintiff also reported that

her failure to appear at earlier appointments was because "taking care of [her husband] came first." (*Id*.). Plaintiff said she prioritized her husband's heart medications over her own, explaining that she could not afford the four dollar copay for her Lexapro prescription. (*Id*.). Plaintiff had applied for a medical card to help with the copay. (*Id*.). Plaintiff explained that Lexapro helped her mood, but admitted that she did not take it consistently. (*Id*.). Plaintiff reiterated her desire for treatment, but stopped attending therapy once she learned that payment or medical insurance was required. (*Id*.). Dr. Swanson prescribed Citalopram, "again emphasizing [the] importance of taking as prescribed continuously for 6 to 8 weeks . . . acknowledging that [Plaintiff] may not, for now, be able to pay for/obtain this medicine." (*Id*.).

## Examining and Non-Examining Consultants

On February 11, 2011, Roopa Karri, M.D., a consultative examiner for the Bureau of Disability Determination Services, noted Plaintiff could not walk more than 50 feet without support, moved very slowly, had difficulty getting in and out of a chair, struggled getting on and off the exam table, and required a cane to walk. (R. at 369). Plaintiff's range of motion in hips, elbows, and wrists was normal, but she had range of motion limitations in her shoulders, ankles, knees, and spine; exhibited tenderness in the lumbar spine, knees, hips, and both sacroiliac joints; and had decreased sensitivity to pinprick in the feet and hands. (*Id*.). The mental status examination showed good hygiene and grooming, and excellent overall effort

and cooperation. (R. at 370). Plaintiff had no apparent cognitive difficulties, signs of depression, agitation, irritability, or anxiety. (*Id*.).

On April 22, 2011, Norton B. Knopf, Ph.D., a consultative examiner, performed a mental status evaluation and opined that Plaintiff's personality is "best characterized as depressive and histrionic." (R. at 412). Dr. Knopf added that "there are no indications that the claimant is not competent to manage her own affairs." (*Id*.). Dr. Knopf identified Plaintiff as suffering from "Adjustment Disorder, With Mixed Anxiety and Depressed Mood," and noted Plaintiff's "demeanor was cooperative, but perhaps exaggerated" and information from Plaintiff was "questionably reliable." (*Id*.).

On April 27, 2011, S. Hill, Ph.D., a State agency mental health consultant conducted a psychiatric review and determined Plaintiff's mental impairments were not severe. (R. at 413). Dr. Hill identified the source of Plaintiff's difficulties as "Anxiety-Related Disorders" and noted Plaintiff showed no signs of depression. (R. at 425). The examiner's notes point to concerns about Plaintiff's credibility, particularly regarding Plaintiff's ability to walk without an assistive device: "claimant displayed an inability to ambulate w/o an assistive device . . . when it was clearly noted by the [field office] that claimant had no observable impairments . . . and did not use an assistive device." (*Id*.). Dr. Hill opined that "medical evidence does not support the intensity of limitations [Plaintiff] expressed." (R. at 426). On May 9, 2011, Calixo Aquino, M.D., a State agency medical consultant reported that Plaintiff did not exhibit severe impairments. (R. at 428). In July 2011, James

Madison, M.D. and David Voss, Ph.D., state agency consultants at the reconsideration level, noted psychological allegations were consistent with the medical evidence, while X-rays revealed no pathology that should cause the kind of pain or limitation Plaintiff described and demonstrated. (R. at 433).

**Plaintiff's Testimony**

Plaintiff testified she had pain in her back and legs that prevented her from working, and explained that her lower back hurt the most. (R. at 55). Plaintiff described the pain as an eight out of ten. (*Id*.). She used a heating pad and took medication to manage the pain; described an aching pain in her right arm as a ten out of ten; and explained that she sometimes gets migraines, which her doctors told her probably came from her problems with her ear. (*Id*.). Plaintiff said that while some days she "can't turn over in bed," other days she can walk about half a block. (R. at 62-64). She has been cane-dependent since her hip injury and uses her cane daily, even in the house, relying on it for balance. (R. at 64, 75). Plaintiff explained, "I can sit for about 30 minutes, maybe 45. I'll shift from side to side because I'm hurting a lot." (R. at 64). Plaintiff added that the shifting was due to her back pain. (*Id*.). Plaintiff stated that she could not carry a gallon of milk in her right hand "because it drops," but she could carry a gallon in her left hand. (*Id*.). Plaintiff also said she could not pick coins off a table because, "when I go to get them I really don't feel them." (R. at 65).

Plaintiff described the pain in her neck as a "burning sensation" extending from her shoulder all the way down her back; the pain extended down her right arm and

it caused coldness and numbness in her fingertips. (R. at 66). Plaintiff experienced ongoing swelling in her left arm. (R. at 67-68). Plaintiff wears a patch and a brace to help control the swelling. (R. at 68). Plaintiff reported that her physician said she had reached "maximum medical improvement" and she could return to work at the light to medium work level, but her health has declined and her tendonitis in her arm and pain in her back are "constantly giving [her] problems." (R. at 72-73).

Plaintiff sees her primary care doctor four or five times per year because she does not have a medical card. (R. at 55). Plaintiff testified that she needs to "get a hold of some money to pay for [her medication]," and that she has difficulty with transportation to the pharmacy. (R. at 60). Plaintiff reports that she could not enter physical therapy for her arms because "they all said it was full" and because she did not have medical insurance. (R. at 69). Plaintiff explained her confusion about billing and medical insurance, and how that would affect her access to medical care. (R. at 74). Plaintiff said she sometimes missed appointments because she did not have carfare. (R. at 78).

Plaintiff's husband, Anthony Moore, completed a Third Party Function Report on March 1, 2011, and described Plaintiff's difficulties with opening jars, cooking, and putting on her shoes because of pain in her back and arms. (R. at 231). He noted Plaintiff spends her days taking her medication, watching television, looking out the window, and walking short distances. (R. 232). He noted Plaintiff can use the toilet, "with help," cannot tie or button her clothes, and cannot get in and out of the bathtub or wash independently. (*Id*.).

# V. DISCUSSION

Plaintiff raises two arguments in her request for reversal or remand: (1) the ALJ's credibility assessment of her pain is "patently wrong"; and (2) the ALJ's RFC finding is not supported by substantial evidence.

## A. The ALJ improperly discredited Plaintiff's pain allegations and failed to adequately explain her adverse credibility finding.

The ALJ discounted Plaintiff's pain allegations by improperly relying on a lack of objective medical evidence, a trip she took to Wisconsin, one instance where she appeared without a cane, limited treatment, and a failure to follow-up with a doctor's appointment. An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008). Although a reviewing court defers to an ALJ's credibility finding where it is not patently wrong, the ALJ still must competently explain an adverse credibility finding with specific reasons supported by the record. Social Security, § 205(g), 42 U.S.C.A. § 405(g). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96–7p.

Plaintiff testified at the hearing that pain in her neck lasted constantly for two years and that she experienced debilitating swelling and numbness in her arms. (R. at 60, 67). She further explained, "I can sit for about 30 minutes, maybe 45. I'll shift

from side to side because I'm hurting a lot." (R. at 64). Plaintiff added that the shifting "side to side" was due to her back pain. (*Id.*). Plaintiff's husband described her severe pain and difficulties with dressing, bathing, and doing basic household activities. (R. 231-32). The ALJ disregarded Plaintiff's testimony as to her pain because "the objective evidence of physical problems is very limited," and because "the claimant's alleged impairments are not fully supported by the medical records." (R. at 31, 32).

This analysis is legally insufficient. An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano,* 556 F.3d at 562 (citing SSR 96–7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart,* 449 F.3d 804, 806 (7th Cir. 2006) ("[T]he administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Lack of objective evidence to fully support allegations of pain is not a legitimate basis for rejecting a claimant's credibility. SSR 96–7p; *see Adaire v. Colvin,* 778 F.3d 685, 687 (7th Cir. 2015) ("[The ALJ's] principal error, which alone would compel reversal, was [ . . .] discounting pain testimony that can't be attributed to 'objective' injuries or illnesses–the kind of injuries and illnesses revealed by x-rays."); *Hall v. Colvin,* 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain but only the applicant's or some other witness's say so").

The ALJ disregarded Plaintiff's accounts of pain, focusing instead on isolated

incidents in which Plaintiff denied pain. The ALJ noted that "several treatment records show no pain complaints at all." (R. at 32). Although Plaintiff denied pain on three occasions in 2010, Plaintiff also reported pain during that same period. (R. at 348). Further, the record provides no context as to the pain being denied. On February 10, 2010 and June 1, 2010, the record states "denies pain today 0/10" (R. 379, 380), but then immediately notes "[patient] is here for low back pain" (R. at 379) and patient "is here for back pain and hip pain over 2 years." (R. at 380). On August 13, 2010, the progress note states "head cold denies pain" (R. at 378) and then continues to discuss Plaintiff's lower back injuries as well as tenderness in her left arm from shoulder to wrist, and pain noted as 5/10 in the left arm. (R. at 378). The ALJ relies on this "denial of pain" notation for that specific day, either for a head cold or for some unspecified reason, in her credibility analysis, without acknowledging that the doctors' visits were for Plaintiff's ongoing pain, and the notes indicated Plaintiff was in chronic pain.

SSR 96–7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted). The ALJ failed to address both Plaintiff's testimony about pain and her husband's March 1, 2011 report.

Moreover, medical records from 2008, 2009, 2011, and 2012 substantiate

Plaintiff's allegations of neck, back, arm, and sinus pain. (R. at 55, 62, 64, 66, 68-69, 73, 75, 231, 292, 297, 339, 348, 374, 378, 383, 386-387, 437, 440, 445). These records reflect the effects of Plaintiff's purported pain: her difficulties taking care of herself, her limited mobility, and her ongoing and slowly worsening sinus, neck, and joint pain. (*Id.*) The ALJ may not ignore circumstantial evidence, medical or lay, which does support a claimant's credibility. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539–40 (7th Cir. 2003). The ALJ improperly relied on a lack of objective medical evidence and a few isolated denials of pain in order to justify an adverse credibility finding as to Plaintiff's pain.

The ALJ also finds Plaintiff incredible because she went on a trip to Wisconsin, concluding "claimant's decision to go on vacation tends to suggest that the alleged symptoms and limitations may have been overstated." (R. at 32). The ALJ does not substantiate this analysis. On the contrary, evidence elsewhere in the record indicates that Plaintiff visited family in Wisconsin and "slept little or not at all" during her stay. (R. at 458). The ALJ never inquires as to the purpose of this trip or asks about Plaintiff's medical condition while in Wisconsin. *See Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011) ("[An ALJ] must explain perceived inconsistencies between a claimant's activities and the medical evidence.").

Additionally, the ALJ based her adverse credibility finding on one instance in which Plaintiff appeared without her cane. (R. at 31). The ALJ noted that the claimant did not appear with a cane while at the Field Office on December 2, 2010. (*Id.*) The ALJ concluded that Plaintiff has "limited credibility" because "there is no

evidence of ongoing use or need for a cane." (R. at 31). This conclusion fails to acknowledge Plaintiff's husband's third party report, as well as her treating physician, physical therapist, and the consultative examiner all noting her difficulty ambulating more than 50 feet or half a block. (R. at 64, 75, 76, 302, 386-387, 396). Specifically, Dr. Virkus suggested she transition to using a cane in March 2008. (R. at 302). In routine checkups in February 2009 at Englewood, Plaintiff described hip and back pain at a 6-7/10 and the treating physician there recommended pain medication and use of a cane. (R. at 386-387). At the consultative examination in February 2011, Dr. Karri observed Plaintiff could not walk 50 feet unassisted. (R. at 369). The ALJ failed to consider relevant evidence of Plaintiff's ongoing need for a cane. The ALJ cannot disregard such evidence. "Although the ALJ need not discuss every piece of evidence in the record, [s]he must confront the evidence that does not support [her] conclusion and explain why it was rejected." *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004). The ALJ's discrediting Plaintiff's testimony about her reliance on a cane did not satisfy the obligation to build the requisite "logical bridge" between the evidence and the ALJ's conclusions. *See, e.g., Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009).

The ALJ further discredited Plaintiff's testimony on pain because she received only limited treatment and any treatment "the claimant did receive after December 4, 2009, has been essentially routine and conservative in nature, with only 2 physical therapy visits in addition to an initial evaluation." (R. at 31). The ALJ adds that "records show such a substantial improvement that she was discharged after

only two therapy visits." (*Id.*). In fact, the records from the relevant physical therapy in 2010 do not describe why Plaintiff attended only two sessions after the initial visit and say nothing about improvement or reasons for discharge. (R. at 348). The ALJ does not acknowledge that in these same physical therapy sessions Plaintiff identified back pain at 7/10 and hip pain at 5/10. (*Id.*). Further, the ALJ does not account for the physical therapist's notes indicating Plaintiff's knee gives out, and that Plaintiff cannot stand more than 5-10 minutes, sit for 30 minutes, or walk more than half of a block. (*Id.*). The ALJ improperly ignored this evidence. *Murphy v. Astrue,* 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion.").

Moreover, the ALJ cannot draw an adverse inference without first asking the plaintiff why she no longer attended the physical therapy sessions or missed doctors' appointments. In the Seventh Circuit, "infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft v. Astrue*, 539 F.3d 668, 678–79 (7th Cir. 2008); *see* SSR 96–7p. Prior to drawing a negative inference about a claimant's symptoms from a failure to attain certain treatment, however, the ALJ must first consider any explanations that the individual may provide or other explanatory information in the case record. SSR 96-7p; *see Craft*, 539 F.3d at 678–79 ("An inability to afford treatment is one reason that can 'provide insight into the individual's credibility.'") (citing SSR 96–7p).

Here, Plaintiff testified that she did not have carfare to get to the doctor. (R. at 78). Plaintiff further testified that she did not seek physical therapy treatment for her arms because "they all said it was full" and because she did not have medical insurance. (R. at 69). Plaintiff explained her confusion about billing and medical insurance, and how that would affect her access to medical care. (R. at 74). The ALJ does not account for any of these reasons for missing appointments before discrediting Plaintiff's testimony and drawing an adverse inference. This is insufficient in evaluating Plaintiff's credibility.

Finally, the ALJ finds Plaintiff's failure to return for a follow up appointment with Dr. Swanson "raises suspicion that her impairments may not have been as troublesome or disabling as has been alleged." (R. at 32). The ALJ's conclusion ignores evidence from Dr. Swanson explaining some of the reasons Plaintiff cited for her failure to receive regular treatment. Dr. Swanson's report revealed Plaintiff "had previously sought recommended therapy at Englewood [Mental Health Clinic] but stopped after that clinic's request for financial documents. She believes that Community Mental Health Council would also require payment, and further she has no transportation to get there." (R. at 458). In a later visit Plaintiff informed Dr. Swanson that she missed an appointment with him because she had to care for her husband. (R. at 460). The ALJ does not address any of this evidence. *See* SSR 96-7p ("The explanations provided by the individual may provide insight into the individual's credibility. For example . . . The individual may be unable to afford treatment and may not have access to free or low-cost medical services."). SSR 96-

7p. The ALJ improperly relied on Plaintiff's inconsistent attendance for treatment in her adverse credibility finding without exploring why Plaintiff did not seek further treatment.

## B. Summary

Because the Court is remanding on the credibility issue, the Court chooses not to address Plaintiff's argument that the ALJ erred in her RFC determination. On remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of evidence. Specifically, Plaintiff argues that a 2008 medical report noting Plaintiff had reached "maximum medical improvement" should have been considered as evidence in determining Plaintiff's residual functional capacity and credibility. As already noted, the ALJ must consider all relevant evidence, even that evidence that predates the earliest disability date. *See Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010). The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. Finally, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings is **GRANTED**. Defendant's Motion for Summary Judgment [20] is **DENIED**. Pursuant to sentence four of 42 U.S.C.

§ 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTER:

Dated: October 8, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge